### 12418

#### BOLT v. LIGON

(142 S. E., 504)

1. CONTRACTS—INTENTION OF PARTIES IS TO BE ASCERTAINED AND GIVEN EFFECT IN THE INTERPRETATION OF CONTRACTS.—The cardinal rule in the interpretation of contracts is to ascertain the intention of the parties and to give effect to that intention if it can be done consistently with legal principles.

2. CONTRACTS—SURROUNDINGS AND CIRCUMSTANCES OF PARTIES MAY BE RESORTED TO IN INTERPRETING AMBIGUOUS CONTRACT.—Surroundings and circumstances of parties may be resorted to to throw light

Note: Ascertainment of intention of parties as cardinal rule of construction of contract, see 6 R. C. L., 835; 2 R. C. L. Supp., 218; 4 R. C. L. Supp., 443; 5 R. C. L. Supp., 372; 6 R. C. L. Supp., 412; 7 R. C. L. Supp., 201.

Surrounding circumstances to be considered in interpretation of ambiguous contract, see 6 R. C. L., 849; 2 R. C. L. Supp., 226; 4 R. C. L. Supp., 446; 5 R. C. L. Supp., 373; 6 R. C. L. Supp., 415; 7 R. C. L. Supp., 203.

upon and aid in the interpretation of a contract, where it is ambiguous.

3. CONTRACTS—COVENANT OF ONE SELLING "DRUG STORE" NOT TO ENGAGE IN COMPETING BUSINESS HELD NOT LIMITED TO STORE SELLING PURE DRUGS EXCLUSIVELY, BUT TO INCLUDE ALL PROPERTY AND MERCHANDISE SOLD IN DRUG STORE.—Where defendant on selling his drug store and good will covenanted not to directly or indirectly conduct any drug store in competition with the business sold, *held* that, taking into consideration the intention of the parties and circumstances surrounding execution of contract, the words "drug store" were not limited to store selling pure drugs and medicines exclusively, but prohibited defendant from selling any and all property and merchandise which was sold in the drug store, including the conducting of a kodak department for developing films.

Before DENNIS, J., Spartanburg, October, 1927.    Affirmed.

Suit by C. L. Bolt against J. T. Ligon.    Decree for plaintiff, and defendant appeals.

. The decree of Judge Dennis is as follows:

This is an action brought by plaintiff against the defendant for the purpose of enjoining the defendant from violating the terms and provisions of a certain contract of date May 29, 1925, whereby the defendant sold and conveyed to the plaintiff a certain business in the City of Spartanburg, known as Ligon's Drug Store, together with the good will thereof, and contracted and bound himself for a period of five years from that date not to directly or indirectly, as partner or as stockholder, conduct any drug store or cigar stand in competition with the business so sold.    The cause was by consent referred to the Master for this county, who in due course held references and made his report, finding in favor of the defendant and recommending that the prayer for injunction be denied and the complaint be dismissed.

From his findings and report, the plaintiff appeals by a number of exceptions, and brings the entire matter before me for review.    The cause was argued before me at Spartanburg during the September term of this Court, and I have given the said report and the arguments most careful and thoughtful consideration.

Having reached the conclusion that the Master's decision and recommendations are wrong and that the plaintiff is entitled to the relief prayed for, I shall briefly set forth my own conclusions and the reasons which had led me thereto.

There is little, if any, dispute between the parties as to the essential facts of the case; the principal matters at issue depending upon the proper construction of the bill of sale in question and the intention of the parties as gleaned therefrom.

On May 29, 1925, the defendant executed to the plaintiff a bill of sale of said drug business. It is not necessary to quote that document in detail here, as certain excerpts which I shall quote from it sufficiently show the intention of the parties, when considered in connection with the surrounding facts and circumstances. It provides, amongst other things, as follows: "I, J. T. Ligon, the sole owner and proprietor of Ligon's Drug Store, Incorporated, * * * do hereby sell unto C. L. Bolt, etc., all that stock of goods, fixtures, licenses, rights, appurtenances and privileges incidental to that business known as Ligon's Drug Store, Inc., situated on the corner of Church and Main streets, in Spartanburg, S. C., and known as No. 100 Main Street, together with any and all private formulas for compounding mixtures, and the good will of said business, and the said J. T. Ligon does hereby agree as part of the consideration that he will not conduct, directly or indirectly, or as partner or as stockholder, any drug store or cigar stand in competition with the business herein sold within the city of Spartanburg for a period of five years from this date."

The real point in dispute between the parties is as to just what was meant by the use of the expression wherein Ligon agreed for five years not to "conduct any drug store or cigar stand in competition with the business herein sold."

The defendant contends that the expression "drug store" must be construed to mean a "store selling drugs exclusively," and further contends that those words were never intended to preclude him from entering into competition

with the plaintiff by selling any and every other line of goods
and merchandise carried in the stock of Ligon's Drug Store,
except pure drugs, medicines and cigars.

Reading the contract in the light of the surrounding facts
and circumstances, I cannot accept such an interpretation of
it.

The law as to the interpretation of contracts is very
clearly and forcefully stated in 6 R. C. L., pp. 225–
238, as follows: "Generally stated, the cardinal rule
in the interpretation of contracts is to ascertain the intention
of the parties and to give effect to that intention if it can be
done consistently with legal principles. It has been said that
to this paramount rule all others are subordinate. The par-
ties should be bound for what they intended to be bound
for and no more. * * * In other words, the object to be
obtained in construing a contract is to ascertain the meaning
and intent of the parties as expressed in the language used.
* * * Neither the form of a contract nor the name given
it by the parties controls its interpretation. In determining
the real character of a contract, the Courts always look to its
purpose rather than to the name given it by the parties.
* * * It may be said, therefore, that the proper construction
of a contract does not depend upon any name given it by
the parties, or upon any one provision, but upon the entire
body of the contract and its legal effect as a whole. * * *
The intention of the parties which the Courts seek to dis-
cover in giving construction to a contract is to be gathered
not from the direct words and phrases, but from the whole
context of the agreement. In fact, it may be said to be a
settled rule in the construction of contracts, that the inter-
pretation must be upon the entire instrument and not merely
on disjointed or particular parts of it. The whole context is
to be considered in ascertaining the intention of the parties,
even though the method of inquiry is to ascertain the mean-
ing of an isolated clause. Every word in the instrument
must be taken to have been used for a purpose, and no word
should be rejected as mere surplusage if the Court can dis-

cover any reasonable purpose thereof which can be gathered from the whole interpretation. * * * The Courts will look to the entire instrument, and, if possible, give such construction that each clause shall have to effect and perform some office. Likewise where a contract as a whole disclosed a given intention, and certain words or clauses would, if taken literally, defeat the intention, they will be construed so as to be consistent with the general intent."

In *Anderson v. Holmes,* 14 S. C., 165, the Court says: "The object of construction is to ascertain what the parties meant by the terms and expressions used, and where the intent can be clearly and distinctly ascertained it will prevail, not only in cases in which it is not fully and clearly expressed, but even when it contradicts particular terms of the agreement. The general intention, to be collected from the whole context and every part of a written instrument, is always to be preferred to the particular expression"—citing cases.

Another rule is that the surroundings and circumstances of the parties may be resorted to to throw light upon and aid in the interpretation of a contract, where it is ambiguous.

In order to reach any intelligent conclusions as to the intention of the parties, therefore, the above rules of interpretation, coupled with the surrounding facts, must be taken into careful consideration.

The facts, as I find them from the evidence, are in substance as follows, in so far as they are material:

For a great many years prior to May 29, 1925, J. T. Ligon had been operating a business at the junction of North Church and East Main streets, in the city of Spartanburg, a business which had become widely and favorably known as Ligon's Drug Store. The business had gradually grown from a modest beginning to large proportions, and at the time of the sale had a very large patronage, as shown by its annual sales of approximately $150,000. The character of

the stock of goods carried, too, had become quite different
from the stock of goods carried in drug stores in the years
gone by; Ligon's Drug Store carried quite a varied assort-
ment of merchandise of almost all kinds—certainly a large
number of articles that have no necessary relation at all to
drugs and medicines. The complaint sets forth by name a
large list of such articles so carried in the stock of said
business, and the proof shows that they were carried in stock
when said business was sold to the plaintiff.

Included in this varied assortment of merchandise, and
aside from drugs, medicines, proprietary remedies, and such
things as may be properly and logically classed as "drugs,"
the evidence shows that various so-called "departments" of
the business contained such things as:

Fountain pens of approximate invoice value of...$2,000.00
Syringes and rubber goods of all sorts ..........    700.00
Tobacco and cigars .........................  1,000.00
Stationery of various sorts ...................  1,000.00
Soaps of various assortments .................    500.00
Kodaks and kodak supplies ..................  2,500.00
Kodak department for developing, producing per
     month ......................$500.00 to    700.00
Combs and brushes ..............$300.00 to    500.00
Toilet articles of varied assortments ...........  3,000.00
Razors and razor blades ............$300.00 to    500.00
Candies, sales amounting to about $7,000 a year.

The said Ligon's Drug Store also handled at and before
the time of the sale such other articles as: Chemical bottles;
sponges; formaldehyde fumigators; playing cards; flash-
lights; Diamond dyes; Blue Ribbon malt; toilet paper;
Absorbine, Jr.; Bon Ami; leather goods of various sorts,
including pocketbooks, ladies' handbags, leather cases and
toilet sets; rubber goods of various sorts, including rubber
syringes and hot water bottles; thermos bottles; Wilson's
gargle; pocketknives; ink; watches; clocks; cameras; hair
dressing; combs; brushes; alum; Veronica water; Pluto

water; ginger ale; Lysol; copperas; lye; chemical bottles; Zonite; cigar holders; cigarette holders; carbides; malt; sulphur; candles; Certo; Rit dye; flashlight cases; shoe polish; toilet waters; toys; Herolin hair dressing; a varied assortment of seeds and fertilizers and other articles logically connected with the seed business.

The evidence shows that the drug department of the business did not exceed 50 per cent. of the value of the goods in stock, and probably did not amount to so much as that. The total turnover of the business in the course of a year was to a very large extent made up of the sales of merchandise of the character above enumerated, aside from drugs.

Some two years before the sale to plaintiff of this business, the defendant enlarged his business by adding to his stock of trade a varied assortment of seeds, including fertilizers, bird feed, cages, etc., and other articles connected with the seed industry, and in order to enlarge his storeroom space, he cut an archway through the wall of Ligon's Drug Store, and took in the adjoining storeroom, where he stored not only the seeds and things connected therewith, but also transferred and kept in that room various other kinds of merchandise above described, including the prescription counter of his drug store.

The entire business, however, as everybody connected with it concedes, was widely advertised and known as "Ligon's Drug Store," and all of said property and merchandise belonged to Ligon's Drug Store. In other words, the seed business was just as much a part of Ligon's Drug Store as was the drug department or any other department thereof. In my view, therefore, it makes no difference that the seeds and certain other articles of merchandise were actually carried in the separate storeroom, nor is the fact of any significance that this additional storeroom was called "Ligon's Seed Store." It was so called and so maintained merely for convenience. The terms of the bill of sale are

so broad that it can scarcely be disputed. I think that it conveyed to the plaintiff everything of every character, and everything incidental to or connected in any way or manner with Ligon's Drug Store, including his good will. It therefore conveyed the seed department and everything connected with it or incidental to it.

As to the consideration which was actually paid to the defendant incident to this sale, the proof is that plaintiff paid approximately $28,000 for the inventory price of the merchandise. He paid $5,000 for the fixtures and about $7,000 for the good will and as a consideration for defendant's agreeing for five years not to "directly or indirectly * * * as partner or stockholder conduct any drug store or cigar stand in competition with the business herein sold."

It appears that Dr. Bolt, a man of long experience in the drug business and already owning two drug stores in the City of Greenville, came to Spartanburg as a stranger to enter the drug business in a new field. It is apparent from the contract, in the light of the surrounding facts, that Dr. Bolt was extremely anxious, upon entering into this strange field, to get rid of Dr. Ligon as a competitor in the "business" which he was buying, and which business, it must be remembered, was not purely a "drug store," but a mercantile business of large proportion, for defendant's good will and as an inducement or consideration for his remaining out of business as a competitor for five years. It is obvious to my mind that Dr. Bolt, as a prudent business man under the circumstances, would not have been willing to pay such a sum for the business purchased and the good will if he had any idea that Dr. Ligon could, the next day after the sale, put up an adjoining business and enter into full competition with him as to everything except cigars and pure drugs used solely for humans. One would naturally have expected plaintiff to adopt some appropriate method of binding Dr. Ligon not to enter into such competition, and I think it equally true that one would have expected Dr. Ligon to

have .expected to be bound in some appropriate way not to enter into such competition.

Another fact of some significance which may be mentioned in passing before considering the actual words and phrases of the bill of sale is that Dr. Ligon's own definition of a "drug store" is most significant as throwing light upon what must have been in the minds of both parties when the contract was drawn and signed. Dr. Ligon states in substance and effect that a "drug store may be any kind of a stock of merchandise of almost any varied assortments, which includes drugs." He says that so long as the drugs are not crowded off the shelves by the other merchandise, it will still remain a drug store. According to his definition then, a seed store may really be a drug store, if it contains a drug department, and it may still contain all sorts of other articles of merchandise and would still be a drug store. His contention is, however, that so long as he does not maintain a general prescription department for the handling of drugs for humans, that he is not prohibited by the contract from competing to the utmost limit with plaintiff as to any and every other kind of merchandise which he cares to handle, and he frankly states that he intends to handle and sell every kind of merchandise which he cares to handle, including everything that he formerly kept and sold in "Ligon's Drug Store" except human drugs and cigars.

In view of the foregoing facts and in the light .of the legal authorities referred to, let us examine somewhat in detail the terms of the contract itself: Viewing the provisions of the contract as a whole, and having in mind the surroundings of the parties and the object which was intended to be attained, it seems to be apparent that the defendant's attorney's construction of the words "drug store," as used in the restrictive covenant, is entirely too technical, and that such construction was never intended by the parties, and that their real intention would be defeated by such construction. If they had meant to provide that the defendant

was not to compete with the "drug department" of the business sold, it would have been so easy to have said so in definite terms. The defendant is now selling almost every sort of merchandise under the name of "seed store." If he were to sell out the entire business and agree not to directly or indirectly operate any seed store in competition with that business for five years, it would be difficult to perceive how he could then be permitted to continue the operation of his business and sell everything that he had been accustomed to sell, except seed. The bill of sale contained several significant words, phrases, and clauses which I think lead to the conclusion that the words "drug store," as used in the restrictive clause, was intended to preclude the defendant from thereafter entering into competition "with the business therein sold."

The first expression in it refers to Dr. Ligon as "the sole owner and proprietor of Ligon's Drug Store, Inc." The next is that he undertakes to sell to Dr. Bolt "all that stock of goods, fixtures, appurtenances, etc., and privileges incidental to that 'business' known as Ligon's Drug Store, Inc." The "business" is spoken of as "Ligon's Drug Store," and the latter is spoken of as the "business." The terms are used interchangeably as meaning and signifying the same thing. All the way through the bill of sale he speaks of a "business" known as Ligon's Drug Store, and also refers to the "business" as being located at corner of Main and Church streets and "known as No. 100 Main Street." The next significant language is that in addition to conveying the stock of goods, etc., he adds, "together with any and all private formulas, etc., and the good will of *'said business,'* " and the said Ligon "does hereby agree, as part of the consideration, that he will not conduct, directly or indirectly, or as partner or as stockholder any 'drug store' or cigar stand in competition with the business herein sold." What kind of "drug store"? He did not say that he would not conduct any drug store in competition with the "drug department" of

the business herein sold, which he could easily have done, if that had been the intent. It was the "business herein sold" that he bound himself not to compete with. Ligon's Drug Store was not technically a drug store—it was a "business" composed of varied departments. When Dr. Ligon engaged that he would not conduct "any drug store" in "competition with the business herein sold" (which business was much more than a drug store), he must be held to have meant that he would not conduct any store which might compete with "the business herein sold." It seems strange that in every other part of the contract the expression "drug store" should mean something entirely different from the same words when used in the restrictive covenant. In every other connection, those words mean the same thing as "the business" sold, and in the restrictive covenant, defendant is bound not to directly or indirectly conduct any "drug store" (meaning "business") in "competition with the business sold." In my view, the meaning is the same thing as if it had read: That the defendant would not directly or indirectly, as partner or stockholder, "conduct any business in competition with the business sold." It seems plain that the language of the contract was intended to absolutely cut out any possibility of any competition. Every vestige of property connected with the business is absolutely sold and conveyed, and in consideration of a portion of that $7,000, paid by plaintiff, defendant covenants that he will not directly or indirectly compete with the business, and he must be held to this.

It seems to me, too, that this conclusion really represents the construction which Dr. Ligon himself put upon the contract at the outset. It appears in evidence that on June 1st, two days after the bill of sale was executed, Dr. Ligon prepared and presented to Dr. Bolt, with request for him to sign, a paper by which Dr. Bolt agreed (amongst other things irrelevant here): "Third. That C. L. Bolt will not sell or offer for sale or own stock in any store or business

that sells or offers for sale, seed of any kind for planting; stock, poultry, hog or cattle remedies; powders, tonics or foods; stock and farm disinfectants; live poultry or birds; poultry or bird supplies; garden implements; insecticides; garden, lawn and field fertilizers, for a period of five years in the incorporate limits of the city of Spartanburg, S. C."

It will be noted that this paper does not directly undertake to give to Dr. Ligon the right to sell these various named articles (which right he had surrendered under his bill of sale); it merely prohibits Dr. Bolt from selling the same. Both parties appear, however, by their conduct to have taken it to mean that Dr. Ligon should have the right to handle and sell these things, as it appears that from that date he has continued, without objection from Dr. Bolt, to handle and sell them. The preparation of the paper by Dr. Ligon and its presentation by him to Dr. Bolt, with request that he sign it, is to my mind evidence of a recognition on his part that under the broad terms of his bill of sale and the restrictive covenant therein contained, that he had no right to sell any of these enumerated things in competition with Dr. Bolt, and that he had to obtain Bolt's permission before he could even sell such things as seeds and things connected with that branch of the business. He thereby construed his own contract as precluding him from directly or indirectly "conducting any business in competition with the business therein sold."

And such a construction seems to me, in view of the considerations already adverted to, to be fair and equitable. The evidence shows that some two or three months after the sale, Dr. Bolt began to notice various acts of the defendant as infringing upon his covenants, amongst other things, that Dr. Ligon and his agents began to display for sale certain articles similar to those in Ligon's Drug Store. Dr. Bolt soon began to make complaints about these acts, but at first he received assurance that nothing improper was intended. But the competition increased as the months went

by, in spite of protests.   Dr. Ligon and his employees began to patronize Irwin's Drug Store, and there are indications that Dr. Ligon did not exercise any special effort to make good his sale of his "good will."   Soon Dr. Ligon began advertising in the papers a varied assortment of merchandise, including many of the things which Ligon's Drug Store had carried for years.   He also advertised in large print "Ligon's Seed Store—More Than a Seed Store," and apparently in every possible way sought to attract the customers from Ligon's Drug Store to Ligon's Seed Store in direct disregard to his restrictive covenant and of his sale and conveyance to Dr. Bolt of his good will.

Assuming it to be law, as it doubtless is, that the mere naked sale of a going business and the good will thereof, without any restrictive covenant, does not preclude the seller from going into a competitive business; nevertheless, when as in this case, there has not only been a sale of the business and the good will thereof, but a covenant not to conduct any business in competition therewith, the Court of Equity cannot look with approval upon this sort of conduct.

Just how much business the defendant has by these methods deprived plaintiff of is not now under investigation and is unimportant, except to ascertain whether there has been enough of damage done and threatened to plaintiff's business to justify the Court in granting affirmative relief by way of injunction.   That there have been extensive violations of plaintiff's rights, I think is abundantly proven.   The evidence shows that from one wholesale jobber alone in the city of Spartanburg, the defendant had purchased merchandise amounting to more than $4,000, and the evidence shows that the defendant is doing a good business in the merchandise which he is improperly selling.   Just how much damage the plaintiff may have suffered does not appear at this time, but in my view there is abundant evidence of substantial damages sufficient to justify an injunction.

I think I should add, in view of the argument of defendant's attorneys and of certain intimations of the Master in his report, that I find nothing in the evidence which in my opinion justifies any reflection upon the good faith or veracity of Dr. Bolt. His evidence impresses me as having been given in good faith, and it appears to me that he acted in good faith in this matter.

It is therefore, on motion of Wilton H. Earle, and Bomar and Osborne, attorneys for the plaintiff, ordered, adjudged, and decreed:

(1) That the defendant, Dr. J. T. Ligon and his agents and servants, be and are hereby restrained and enjoined for a period of five years from May 29, 1925, from directly or indirectly conducting any business in competition with the business sold to C. L. Bolt on May 29, 1925, and from advertising, selling or offering for sale any articles, goods or merchandise of the same or similar kind or character to any goods which on or prior to May 29, 1925, were carried in stock or offered to sale or constituted a part of the business of Ligon's Drug Store, and from carrying on any business of the kind of that done or carried on by Ligon's Drug Store prior to or on said date, and from in any manner competing with said Ligon's Drug Store in the handling, advertising or sale of any such goods, wares or merchandise; but this order shall not be construed as enjoining the advertisement, handling and sale of any of the articles specially named in the paper signed by Dr. Bolt on June 11, 1925, and hereinabove quoted, it not being intended hereby to interfere with such sales.

(2) That the said J. T. Ligon, his agents and servants, are enjoined during said period from advertising, handling in business, or offering for sale any of the following named articles or goods, wares or merchandise of the following kinds, to wit: Fountain pens; inks; syringes of all sorts; rubber goods; tobacco; cigars; cigarettes; stationery; soaps; kodaks; kodak supplies; kodak films; kodak developing;

combs; brushes; toilet articles; toilet sets; toilet water; perfumery; razors; razor blades; candies; chemical bottles; sponges; playing cards; flashlights; Diamond dyes; Blue Ribbon malt; malts; extracts suitable for cooking; toilet paper; Absorbine, Jr.; Bon Ami; leather goods; leather cases and all articles made of leather and suitable for human use; pocketbooks; ladies' handbags; hot water bottles; thermos bottles; Wilson's gargle; pocketknives; watches; clocks; cameras; hair dressing; alum; Veronica water; Pluto water; ginger ale; copperas; lye; Zonite; cigar holders; cigarette holders; carbides; sulphur candles; Certo; Rit dye; flashlight cases; shoe polish; tops; Herolin hair dressing, and all other articles and goods, even though not herein specifically named, which were carried in stock or sold or handled by Ligon's Drug Store on or prior to May 29, 1925, and which were not included amongst those things which Dr. Bolt agreed not to sell, in the paper signed by him of date June 1, 1925.

(3) That during said period they are enjoined from conducting any kodak department for developing films or otherwise and from accepting films to be developed, and from directly or indirectly attempting, by advertisement, personal appeals, or otherwise, to influence customers or prospective or possible customers of Ligon's Drug Store from patronizing said store or to patronize Ligon's Seed Store in the purchase of merchandise which defendant is enjoined from selling or offering for sale. They are further enjoined during the said period from advertising Ligon's Seed Store so as to create and with the intention of creating the impression on the public that said store can lawfully furnish the public with merchandise of the kind or character that they are hereby enjoined from selling or offering for sale.

Leave is given the plaintiff at any time to apply at the foot of this decree for such additional orders as may be necessary to carry out or enforce compliance with this judgment and decree. This decree is without prejudice to any

right of action for damages, if any, which the plaintiff may have.

*Messrs. Luther K. Brice* and *Lyles, Daniel & Drummond,* for appellant, cite: *Where general and specific provisions of a contract deal with the same subject matter, the specific provisions are to control:* 114 Pac., 429; 115 N. W., 383; 145 Pac., 492; 13 C. J., 537; 97 Am. Dec., 179; 127 N. W., 1109. *Construction of ambiguous contracts:* 13 C. J., 525; 106 S. E., 390; 115 S. E., 712; 151 N. Y. S., 1045; 153 N. Y. S., 985; 102 N. E., 481; 177 Ill., 500; 51 Sou., 853. *Not in province of a Court to change the terms of a contract:* 13 C. J., 541; 84 Pac., 535.

*Messrs. Wilton H. Earle* and *Bomar & Osborne,* for respondent, cite: *Interpretation of contracts:* 100 S. C., 9; 89 S. C., 80, 81; 2 Page on Contracts, Sec. 1113; 13 C. J., 545; 53 Sou., 542. *Doctrine of "ejusdem generis" not applicable here:* 83 S. C., 566; 102 S. C., 498; 106 Pac., 950; 2 Page on Contracts, Sec. 1121.

March 30, 1928.

The opinion of the Court was delivered by MR. JUSTICE BLEASE.

The decree of his Honor, E. C. Dennis, Circuit Judge in this cause, is entirely satisfactory to this Court. The same will be reported.

It is the judgment of this Court that the exceptions to the said decree be and same are hereby dismissed.

MR. CHIEF JUSTICE WATTS and MESSRS. JUSTICES COTHRAN, STABLER and CARTER concur.